**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VICTORIA S. MILLER** | * | |
| **2412 LYTHAM ROAD** | * | |
| **COLUMBUS, OHIO 43220** | * | **Case No. 2:23-cv-4091** |
| | * | |
| **-v-** | * | |
| | * | **Judge** |
| **NATIONWIDE CHILDREN'S** | * | |
| **HOSPITAL, INC.** | * | **Magistrate Judge** |
| **c/o RHONDA L. COMER,** | * | |
| **STATUTORY AGENT** | * | |
| **700 CHILDREN'S DRIVE** | * | **JURY DEMAND** |
| **7TH FLOOR, OCC** | * | **ENDORSED HEREON** |
| **COLUMBUS, OHIO 43205** | * | |
| | * | |

**COMPLAINT**

Now comes the Plaintiff in the above-entitled action and states her Complaint against the

Defendant herein as follows:

**PARTIES AND JURISDICTION**

1.      At all times relevant to this action Plaintiff Victoria S. Miller was a resident of

Columbus, Franklin County, Ohio.

2.      Defendant Nationwide Childrens Hospital, Inc., hereinafter referred to as "NCH",

is a State of Ohio corporation duly authorized and licensed to conduct business in

the State of Ohio from its principal place of business located at 700 Children's

Drive, Columbus, Franklin County, Ohio 43205.

3.      Plaintiff was employed by Nationwide for more than seventeen (17) years,

commencing on October 6, 2003, and ending pursuant to discharge on December

30, 2020.

4.      All of the discriminatory and unlawful employment practices and tortious conduct

1

alleged herein were committed in Franklin County, Ohio and remain ongoing.

5. This action is brought, in part, and jurisdiction lies pursuant to Sec. 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000 (b), as well as the Age Discrimination in Employment Act, hereinafter referred to as "ADEA", 29 U.S.C. Sec. 621.

6. All conditions precedent to jurisdiction under Sec. 706 of Title VII, 42 U.S.C. 2000 (b) have occurred and have been complied with:

    (a) A charge of employment discrimination on the basis of race and age was filed with the Equal Employment Opportunity Commission, hereinafter referred to as "EEOC", within 300 days of the commission and/or maintenance of the unlawful employment practices alleged herein.

    (b) A notification of Plaintiff's right to sue, dated September 15, 2023 was received on or about September 18, 2023, attached hereto as "Exhibit A.".

    (c) The instant Complaint has been filed within ninety (90) days of receipt of the EEOC's right to sue letter.

## FACTUAL HISTORY

7. Plaintiff was hired as a Certified Diabetes Care and Education Specialist by NCH on October 6, 2003 and, by 2018, she was one of the most senior nurse clinicians working in the hospital as a Certified Care and Education Specialist.

8. At that time there were very few individuals within Plaintiff's specialty that were working at NCH at that time.

9. With such seniority, Plaintiff's salary and benefits were commensurate with her experience.

10. In 2018, Plaintiff was 55 years old and had been an employee of NCH for fifteen (15) years.

11. During that year, Plaintiff was involved in a serious automobile accident and sustained serious injuries and, consequently, Plaintiff was forced to take a leave of absence from her job under the Family Medical Leave Act ("FMLA").

12. It was during this time period that Plaintiff first began to take notice of antagonism against her by NCH.

13. On August 25, 2018, during Plaintiff's time on leave, she received a letter from her clinical supervisor notifying her that her 12 weeks of leave was up on August 16, 2018, a full nine (9) days earlier than her receipt of the letter.

14. The letter itself was not written by Plaintiff's supervisor until August 21, 2018; it was not mailed by Plaintiff's supervisor until August 23, 2018; and it was not received by Plaintiff until August 25, 2018.

15. The letter stated that Plaintiff's position could only be held until August 26, 2018.

16. The notification letter gave insufficient time for consideration, let alone compliance.

17. It was at that time that Plaintiff began to believe that her high salary and benefits were being held against her and that her being on FMLA and drawing a paycheck was unacceptable to NCH.

18. The letter continued by stating that if Plaintiff wanted to return to work by August 27, 2018, she would be required to provide notice to her clinical supervisor at least two (2) days in advance, which would have been the date Plaintiff received the

letter, and that such notice required submission of a return-to-work form signed by her physician.

19.   The letter concluded by stating that if Plaintiff was unable to return by August 27, 2018, her position would be downgraded to contingent status.

20.   It was impossible for Plaintiff to comply with either of the options that were presented to her in the letter in the time frame provided.

21.   The letter was written by Plaintiff's supervisor on 8/21; it was mailed on 8/23; it was not received by Plaintiff until 8/25; and it informed Plaintiff that her FMLA expired nine (9) days earlier.

22.   The alternatives posed to Plaintiff were untenable and she protested.

23.    Over a period of time, Plaintiff was able to successfully fight the conditions imposed by the letter of August 21, 2018.

24.   Thereafter, the hospital chose to extend Plaintiff's leave of absence until December 1, 2018.

25.   On January 15, 2019, Plaintiff received a first letter of termination from her clinical supervisor.

26.   The letter notifying Plaintiff of her termination was not received by her until approximately six (6) weeks after the end of her extended leave of absence.

27.   The letter was dated on January 11, 2019; it was postmarked on January 14, 2019; and it was received on January 15, 2019.

28.   The letter stated that Plaintiff would be required to return to work by January 17, 2019 or she would be terminated.

29. Once again, the letter required two (2) days prior notification of her plan to return to work and that such notice also required the submission of a return-to-work form signed by her physician.

30. As before, the correspondence was tardy, it presented Plaintiff with an option that was impossible to meet under any circumstances.

31. It became apparent to Plaintiff that NCH was intent on terminating her employment and that the aforementioned letters were to provide the pretext.

32. After receipt of the letter dated January 11, 2019, Plaintiff engaged counsel as it became evident that her employment at NCH was imperiled.

33. Plaintiff avers that believe the clumsy mismanagement of her return to work masked the true intent of NCH to terminate and/or separate her from her my position based on my age, seniority and benefit package, including salary.

34. During this period of estrangement from NCH, during which Plaintiff's counsel was advocating for her continued employment, she received a second notice of termination from my clinical supervisor on April 24, 2019.

35. The letter was dated April 17, 2019. It stated that Plaintiff was terminated effective April 17, 2019.

36. It was not received until April 24, 2019.

37. Following intervention by counsel, Plaintiff was contacted by NCH via voicemail on May 24, 2019; the message indicated that Plaintiff should report to her department for work on Tuesday, May 28, 2019.

38. Plaintiff avers that her protracted dispute with NCH after her injury accident provided the impetus for NCH to terminate her employment one way or another.

39. Plaintiff further believes that NCH became unwilling to retain her based on her age, seniority and benefit package, including salary, particularly when they were required to continue her compensation during her convalescence.

40. Because Plaintiff was successfully able to preserve her position, she believes NCH was looking for any reason to terminate her employment in order to rid itself of the salary and benefits they were being forced to pay and that they could compensate a younger, less experienced person at a lesser rate.

41. On December 29, 2020, Plaintiff was contacted via email by Stacey Smith, who worked in NCH human resources.

42. Plaintiff was advised that Ms. Smith wanted to meet with Plaintiff, but did not disclose the purpose of the meeting.

43. At 4:30 that day, Plaintiff arrived at Ms. Smith's office; present at the meeting were Ms. Smith, another HR staff member who was documenting the conversation, and Plaintiff's then nursing supervisor, Beth Edwards, RN.

44. Plaintiff was presented with five (5) Facebook screenshots that were taken from a closed Upper Arlington Discussion Forum of which Plaintiff was a member and which Plaintiff commented on from time to time.

45. The posts were made during the height of the George Floyd protests and the months of racial turbulence that attended it in Columbus, Ohio.

46. Under the guise of a fake Facebook profile, the screenshots were obtained from the private forum by a member of a well-known politically oppositional group in Upper Arlington, Ohio that engaged in the practice of accusing several people in the group of racism and reporting so-called politically incorrect commentary to members'

employers in an effort to "cancel" them and damage their job standing and livelihoods.

47. At that time, Ms. Smith would not disclose from whom or how the screenshots were received, but only that the material was obtained from "both inside and outside" the hospital.

48. That would be an impossibility because no staff members were part of the Facebook discussion forum and, therefore, could not have come into possession of the screenshots in question.

49. Plaintiff was taken aback because the statements in question were relatively trivial in nature, but they expressed a political position that was at odds with the tenor of those times.

50. Ms. Smith, who is Caucasian, as is the Plaintiff, went on to state that she found one of Plaintiff's comments on the screenshots personally offensive to her.

51. This comment was affirmed by the other HR representative in attendance, who was African-American.

52. The comment Ms. Smith referenced was unserious on its face; it was made in frustration at continually being delayed in getting home from work during protest marches that clogged the streets and byways.

53. Nothing that Plaintiff ever stated on the forum was racist, but in that particular period of heightened sensitivity and anxiety as to anything even potentially provocative, it seemed that everything that anyone said about virtually any topic was being scrutinized as though it was predominantly a racial comment first and foremost.

54. Plaintiff was unclear as to whether this was a meeting to discuss private Facebook commentary and NCH policy or to discuss personal opinions.

55. The opinions made in the screenshots clearly did not coincide with the views of those attending the meeting.

56. Plaintiff felt nothing but bias from Ms. Smith and the individual documenting the conversation.

57. Plaintiff was not provided an adequate opportunity to contextualize the commentary.

58. It was apparent that the purpose of the meeting was to use it as an opportunity to place Plaintiff's job in jeopardy.

59. Plaintiff inquired three (3) times during the conversation if the purpose of the meeting was to fire her.

60. Ms. Smith stated that if that were the purpose, she would have done so.

61. Having never been written up or reprimanded in her entire time at NCH, Plaintiff was advised by Ms. Smith that she might expect to receive anything ranging from a suspension to written counseling or employee improvement programming.

62. Plaintiff was further advised that "leadership" would be meeting the following day, December 30, 2020, to evaluate the situation and provide recommendations.

63. On December 30, 2020, Plaintiff was notified by Beth Edwards that she was to meet with Tallyn Hicks, the RN director of ambulatory care at NCH, and that it was in "follow-up" to the previous day's meeting.

64. Plaintiff was told by Ms. Hicks that she violated the NCH Standards of Conduct and the NCH social media policy and, despite Plaintiff's over 17 years of service

to the hospital and her employment record, that she was "not suitable to care for the children and families at NCH".

65. Ms. Hicks further stated that Plaintiff's "conduct" was "not in line with the standards, values and mission of NCH" and that therefore, she was terminating Plaintiff's employment.

66. Plaintiff asked that Ms. Hicks provide her with a specific policy violation under the employee handbook or to state with particularity what she did that violated NCH policy; however, Ms. Hicks did not do so.

67. At that time, Plaintiff was told to hand over her hospital badge and that security would be escorting her off the premises.

68. After several moments of uncomfortable and humiliating treatment, Plaintiff left the hospital that she had worked in since October 6, 2003.

69. Plaintiff thereafter filed a grievance for this third termination.

70. On January 22, 2021, Plaintiff had a meeting with Burk J. Dehority, Vice President of Operations at NCH, and expressed that her comments were taken out of context, were clearly not serious on their face and made in jest.

71. However, Plaintiff's termination was made official upon her receipt of a letter dated January 25, 2021 indicating that she had violated the NCH Social Media Policy and the NCH Standard of Conduct.

72. To date, no one has pointed to the provision that Plaintiff allegedly violated.

73. Moreover, no one has articulated to Plaintiff what, in particular, 1) the social media policy actually is; 2) the line, if any, between private communication and work-

9

related communication; and 3) how her alleged conduct impacted her job performance.

74. It is Plaintiff's contention that NCH has been intent on terminating her employment since her leave of absence in 2018 resulting from her serious automobile accident.

75. Plaintiff further avers that NCH was intent on eliminating the salary and benefits that attended her seniority at the hospital and replace her with a younger, less expensive employee.

76. In this respect, NCH has been actively engaged in age discrimination against Plaintiff in violation of the Age Discrimination in Employment Act, hereinafter referred to as "ADEA", 29 U.S.C. Sec. 621 and Ohio Revised Code Section 4112, *et seq.* since that time.

77. Plaintiff further avers that NCH has engaged in outrageous discrimination based on race in violation of Sec. 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000 (b) and Ohio Revised Code Section 4112, *et seq*.

78. Plaintiff avers that NCH acted on an opportunity to use the volatile racial condition of the community during the George Floyd protests, as well as the attendant racial turmoil, to smear Plaintiff and disparage her at her place of employment and amongst her colleagues and continues to do so.

79. In characterizing Plaintiff as a racist and violative of certain unascertained hospital policies, it achieved its primary objective of terminating her employment, which it had been trying to do since 2018.

80. Upon information and belief, Plaintiff was replaced with a younger, less expensive employee and/or employees, and in so doing, based on its efforts relating back to 2018, NCH has engaged in discrimination based on age and continues to do so.

81. Upon information and belief, NCH spread false and disparaging commentary to Plaintiff's fellow employees about her and, based on its use of the aforementioned screenshots, NCH boot strapped age and racial discrimination together to terminate her employment the effect of which is ongoing.

82. Plaintiff thereafter filed for unemployment compensation with the Ohio Department of Job and Family Services ("ODJFS").

83. NCH objected and stated that Plaintiff was terminated for cause and was not entitled to unemployment benefits.

84. At the conclusion of their investigation, ODJFS determined that NCH failed to submit evidence to establish that Plaintiff was discharged for cause and granted her unemployment benefits after which NCH appealed.

85. A redetermination was rendered by the Director of ODJFS on March 18, 2022, which stated: "This agency finds that the claimant was discharged by Nationwide Children's Hospital, Inc on 12/30/2020 without just cause, per Ohio Revised Code Section 4141.29(D)(2)(a). The facts provided do not support that claimant failed to follow company instructions, policy, contract or reasonable standards of conduct."

86. NCH appealed the redetermination and asked that the matter be transferred to the State of Ohio Unemployment Compensation Review Commission for review, which was done on April 8, 2022.

87.     On June 6, 2022, NCH voluntarily withdrew its appeal.

88.     NCH has willfully engaged, and continues to engage, in age and racial discrimination the effect of which was to terminate Plaintiff's employment of over 17 years.

## COUNT ONE – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

89.     At all times material herein, Plaintiff was a qualified individual pursuant to Sec. 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000 (b).

90.     Plaintiff's racial status was a determining factor in Defendant's decision to terminate her employment.

91.     Defendant's discharge of Plaintiff is in violation of Sec. 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000 (b), which prohibits discrimination because of race, in that Defendant discharged Plaintiff because of her racial status.

92.     Defendant's discriminatory conduct relative to Plaintiff was taken with malice, and with reckless disregard to the federally protected rights of the Plaintiff.

93.     As a direct and proximate result of Defendant's discrimination, which is ongoing, Plaintiff has been deprived of economic benefits, including, but not limited to loss of wages and other related benefits.

94.     Defendant's discharge of Plaintiff has caused, and continues to cause, and will cause Plaintiff to suffer substantial damages for pecuniary losses, mental anguish, loss of enjoyment of life, loss of consortium, and other non-pecuniary losses.

## COUNT TWO – VIOLATION OF AGE DISCRIMINATION IN EMPLOYMENT ACT

95.     Plaintiff hereby incorporates paragraphs 1-95 as if fully rewritten herein.

96.     With knowledge of Plaintiff's age, Defendant acted, and continues to act, in a discriminatory manner to deprive Plaintiff of her position and all benefits related thereto, in that Plaintiff's age was a determining factor in the decision to so deprive the Plaintiff.

97.     Defendant acted, and continues to act, willfully with full knowledge that its conduct was prohibited by the Age Discrimination in Employment Act, 29 U.S.C. Sec. 621, or acted with reckless disregard for whether said conduct was prohibited, to deprive Plaintiff of benefits associated with employment based on Plaintiff's age.

### COUNT THREE – VIOLATION OF O.R.C. §4112

98.     Plaintiff hereby incorporates paragraphs 1-98 as if fully rewritten herein.

99.     Plaintiff brings this claim pursuant to Chapter 4112 of the Ohio Revised Code.

100.     Plaintiff has been subjected to ongoing discrimination from Defendant based on race as defined by Chapter 4112 of the Ohio Revised Code.

101.     Plaintiff has been subjected to ongoing discrimination from the Defendant based on age as defined by Chapter 4112 of the Ohio Revised Code.

102.     Defendant terminated Plaintiff's employment as a result of racial discrimination and/or because of her age in violation of Chapter 4112 of the Ohio Revised Code.

103.     Defendant discriminated against Plaintiff by using race as a factor in determining whether to continue her employment.

104.     Defendant discriminated against Plaintiff by considering his age as a factor in determining whether to continue her employment.

105.     Defendant's conduct described herein was, and remains, intentional, wanton, willful, malicious and deliberate.

106.     Defendant's actions were taken in bad faith.

107. Defendant's conduct was in violation of Chapter 4112 of the Ohio Revised Code.

108. As a consequence of Defendant's violations, Plaintiff has been damaged.

## COUNT FOUR – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

109. Plaintiff hereby incorporates paragraphs 1-109 as if fully rewritten herein.

110. Defendant intentionally and recklessly acted in an extreme and outrageous manner so as to cause serious emotional and physical distress to Plaintiff.

111. Defendant's actions were the direct and proximate cause of the severe psychic injuries sustained by Plaintiff.

112. Defendant's conduct was of such a nature that no reasonable person could be expected to endure the same.

113. Defendant's conduct was undertaken with malice and reckless disregard for Plaintiff's rights.

## COUNT FIVE – PUBLIC POLICY TORT

114. Plaintiff hereby incorporates paragraphs 1-114 as if fully rewritten herein.

115. Public policy in the State of Ohio, supported by federal and state law as set forth above, is such that discrimination based on race and/or age are violations of law.

116. Defendant is subject to these laws.

117. Defendant discriminated against Plaintiff with respect to terms, conditions, or privileges of employment based on race and/or age.

118. As a result of this conduct, Plaintiff has been damaged.

119. Plaintiff states a cause of action for Public Policy Tort based on the Title II of the Civil Rights Act of 1964, ADEA, and Sec. 4112 of the Ohio Revised Code.

## COUNT SIX – WRONGFUL TERMINATION

120.    Plaintiff hereby incorporates paragraphs 1-119 as if fully rewritten herein.

121.    On or about December 30, 2020, Defendant wrongfully discharged Plaintiff without cause.

122.    Defendant discharged Plaintiff from her employment in violation of the public policy of the State of Ohio and in violation of the Sec. 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000 (b), the Age Discrimination in Employment Act, 29 U.S.C. §621, and the Ohio Civil Rights Statute, O.R.C. §4112.02.

123.    Defendant discharged Plaintiff in the absence of any justifiable grounds.

124.    Defendant discharge of Plaintiff was wrongful.

125.    Defendant's conduct described herein was intentional, willful, malicious and deliberate.

126.    As a result of Defendant's conduct, Plaintiff has been damaged.

WHEREFORE, Plaintiff requests judgment in favor of Plaintiff against Defendant and the granting of the following specific relief:

1.    Order the Defendant to pay the back pay Plaintiff would have earned, together with related benefits and interest thereon from December 30, 2020, the date the Plaintiff was discharged because of Defendant's ongoing discrimination.

2.    Order the Defendant to pay Plaintiff compensatory damages in an amount to be determined at the trial of this action.

3.    Order the Defendant to pay punitive damages to the Plaintiff for its malicious and/or reckless conduct, an amount to be determined at the trial of this action.

4.    Order the Defendant to pay legal expenses and costs.

5.      Grant such other relief as may be just and proper.


                            Respectfully submitted,


                            /s/ **Collin N. Thomas**
                            _____
                            Collin N. Thomas          (0065337)
                            492 South Third Street
                            Suite 200
                            Columbus, Ohio 43215
                            (614) 280-1860: Telephone
                            (614) 464-3004: Facsimile
                            CollinNThomas@aol.com
                            *Trial Attorney for Plaintiff*


                      **JURY DEMAND**

Plaintiff hereby demands a jury trial of this matter pursuant to the Federal Rules of Civil

Procedure.

                            /s/ **Collin N. Thomas**
                            _____
                            Collin N. Thomas